IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TALIBAH SAFIYAH ABDUL HAQQ | : | CIVIL ACTION |
| | : | NO. 09-0042 |
| v. | : | |
| | : | |
| PENNSYLVANIA DEPARTMENT OF PUBLIC WELFARE | : | |

O'NEILL, J.                                                        MARCH 23, 2010

## MEMORANDUM

Plaintiff asserts four counts of discrimination against defendant, all of which arise out of plaintiff's termination from her probationary position as an income maintenance caseworker for the Pennsylvania Department of Public Welfare.[1]  Presently before me are defendant's motion for summary judgment and plaintiff's response.  For the following reasons, I will grant defendant's motion with respect to Counts IV and VI of the complaint and deny the motion in all other respects.

## BACKGROUND

Plaintiff is a Muslim woman who, during the time period relevant to this case, practiced a form of Hijab (veiling) that required her to cover her whole body with the exception of her hands and her face.[2]  On May 29, 2007, she was hired by defendant as an income maintenance caseworker.  Income maintenance caseworkers are responsible for interviewing applicants for

---

[1]        Plaintiff's complaint initially contained eight counts: (I) discrimination based on religion - disparate treatment; (II) discrimination based on age; (III) discrimination based on age - disparate treatment; (IV) discrimination based on religion - hostile work environment; (V) discrimination based on age - hostile work environment; (VI) discrimination based on religion - retaliation; (VII) discrimination based on age - retaliation; and (VIII) violation of the Pennsylvania Human Relations Act.  On April 15, 2009, having received no response by plaintiff, I granted defendant's motion to dismiss counts II, III, V, and VII.

[2]        She presently also veils her face.

public assistance benefits to determine whether the applicant is eligible for such benefits.  On May 30, 2007, plaintiff began the income maintenance standard training program which is a one year program designed to teach new employees the policies and procedures relevant to the position.  During her time in the training program, plaintiff, like all new employees, was on probationary status.  Approximately thirteen weeks of the program took place in a classroom.  During that phase, the students worked exclusively in a "protective environment" where they were closely monitored by trainers and not permitted to work on real cases.  The remainder of the training program took place in the district office where the level of supervision was more relaxed and trainees worked with real clients.

Erica McCann and Mary Harrison were two of the trainers responsible for instructing plaintiff on various components of the training program curriculum.  Plaintiff claims that both women discriminated against her.  The first alleged act of discrimination occurred at orientation when Harrison was describing the employee dress code to plaintiff's class.  According to plaintiff, Harrison stated that head coverings were generally prohibited except for religious purposes but warned that if employees chose to wear head coverings for religious purposes they would be expected to do so consistently because some women cover their hair as a "fad."  Plaintiff claims this remark was made in a "flip" tone and directed at her because she was the only person in the room wearing a head covering.  Harrison admits stating "if you are wearing head cover today for religious purposes we respect it and accept it.  And it's expected that it would be worn on a daily basis."  She denies, however, that her remark was delivered with a flip tone.

Several days later, plaintiff was having a private discussion with McCann when McCann

allegedly stated that "some people just aren't cut out for this job." Plaintiff understood that statement to be directed at her despite the fact that, at that stage, plaintiff had done no substantive work and therefore McCann had no work-related reason to think plaintiff was not fit for the position.

Plaintiff also claims that other non-Muslims received more "hands-on" and "one-on-one" training than she received. For example, she contends that while her questions were rarely answered by McCann in a timely and helpful fashion, on "at least four or five [occasions,]" several of her classmates received emails from McCann containing instructions and information not offered to plaintiff. Plaintiff's classmates also allegedly benefitted from private meetings with McCann wherein they received additional instruction and training. Likewise, according to plaintiff, McCann guided other students through the classroom lessons step-by-step but did not provide such assistance to plaintiff. McCann disputes that plaintiff received less training than other students. Indeed, she claims that plaintiff received more assistance than other students because "she had the most trouble navigating the computer system."

According to plaintiff, this disparate treatment culminated in a series of employee assessments and performance reviews authored by McCann and other trainers. First, on July 27, 2007, McCann noted in an employee assessment that plaintiff exhibited "poor performance."[3] She wrote "you don't understand computations[,] income limits and potential categories of eligibility. Not able to keep up with class." Under the category of "progress," McCannn noted "you don't understand categories for medical. You don't follow directions that will help you

_____

[3]     The evaluation form used by McCann provided two options: "exceptional performance" and "improvement needed." McCann crossed out "exceptional" and inserted "poor."

understand." With respect to plaintiff's computer skills McCann wrote "you lack an understanding of basic computer skills. Failed to follow directions on CAIREG by deselecting [line number] 03." McCann's evaluation urged plaintiff to "keep your tools folder readily available [and to] [a]sk questions and participate in class." In closing, McCann wrote "[i]mprovements need to made [sic] by 8-3-07." The evaluation was signed by McCann and by plaintiff.

The second assessment, filed by McCann three days later, reiterated many of the same concerns. Plaintiff again received an overall evaluation of "poor performance." McCann wrote "[y]ou were given a Healthy Horizon exercise to complete on 7/24/07. The exercise was not complete and you didn't understand how to complete. You did not want any assistance from supervisor." With respect to plaintiff's progress: "[y]ou are not able to understand income limits. You were using the PSA income limits instead of Healthy Horizon income limits." Going forward, plaintiff was instructed to "[use] your Desk Reference income eligibility to better understand income limits [and to] [c]omplete Healthy Horizon exercise by 8-1-07." Both McCann and plaintiff signed this evaluation.

Sometime in late July 2007,[4] plaintiff informed Ernestine Burnside, plaintiff's union representative, that she believed she had suffered discriminatory treatment during her employment with defendant. On July 27, 2007, McCann allegedly told plaintiff that if she refused to resign McCann would submit paperwork to have her fired and that there was no point to plaintiff completing the training because she would not pass it successfully. McCann denies that she made such statements.

---

[4]     The exact date of that conversation does not appear in the record.

On August 1, 2007, plaintiff followed up with Burnside via email. In that email, she detailed the allegedly discriminatory treatment she had received, including a description of the July 27, 2007 conversation with McCann. After the conversations with Burnside, plaintiff claims that McCann acted "very differently" toward her. For example, during a class session two days later, McCann stated in front of the class that plaintiff had been trying to "boycott" McCann but that "it was OK . . . [McCann] understood why. . . . It was because [plaintiff] couldn't do the job . . . but [McCann] would help [plaintiff] for as long as [plaintiff] was there." McCann denies making such statement or treating plaintiff differently after plaintiff communicated her concerns to Burnside.

The third assessment, filed by McCann on August 7, 2007, was again critical of plaintiff. This time, McCann labeled plaintiff's performance "unsatisfactory." She noted "[y]ou were not able to complete the MA workshop timely. You were behind on the MA computation pages and the [illegible] screens. You have to be able to find a policy." With respect to plaintiff's progress, McCann wrote "you were not able to find in policy the applicant recipient groups and income to be counted for spouses." Further, "[i]mprovement is needed in navigating through CIS." Finally, McCann wrote "[y]ou have to review policy and complete computation pages timely. You have to be able to accurately and timely complete cases. Improvement needed by 8-9-07 Assessment." Again, the evaluation was signed by both McCann and plaintiff.

The fourth assesment, filed by trainer Angela M. Lynch, was filed on August 8, 2007. Lynch's overall evaluation of plaintiff's work product was "improvement needed." She exhaustively detailed plaintiff's mistakes in completing that day's workshop. Among other concerns, Lynch noted "[y]ou could not process the case successfully without assistance from

this facilitator."  In concluding, she warned "[t]hese suggestions must be adhered to immediately, because you will be handling live cases effective [sic] your return to the district office on Monday, 8/13/07."  Both Lynch and plaintiff signed the evaluation.

On August 30, 2007, McCann filed plaintiff's mid-probationary performance review.  A performance review is a formal appraisal of an employee's work, which occurs twice during the first six months of an individual's probationary employment.  Unlike assessments, which evaluate an employee's work on a given assignment, performance reviews assess an employee's job performance over an extended period of time.  In plaintiff's performance review, she received a score of "unsatisfactory" in five of six categories: (1) job knowledge/skills; (2) work results; (3) communications; (4) initiative/problem solving; and (5) work habits.  In the sixth category, interpersonal relations/equal employment opportunity, she received a grade of "satisfactory."  Under "employee strengths" McCann wrote "[a]t this time [plaintiff's] individualized strengths can not be identified.  Through constant monitoring and training [plaintiff's] attributes and abilities may be recognized as a contribution to the department."  She also included a full page of additional commentary addressing plaintiff's performance deficiencies.  The performance review was signed by McCann and plaintiff and then reviewed and signed by Deborah Eubanks.[5]  On the form, plaintiff noted her disagreement with the rating she received and requested a conference.

The requested conference was held on September 20, 2007.  McCann, Burnside, Eubanks and plaintiff were present.  According to meeting notes taken by Shanti Seelal, a human resources analyst with DPW, plaintiff "acknowledged she encountered problems at the onset.  However, she indicated she felt she is getting better with CIS and is capable of improving."

---

[5]     It is unclear from the record who Deborah Eubanks is.

Plaintiff was informed that her trainers would not, at that time, recommend that she be terminated but that she must show significant improvement. She was also warned that "if her performance remain[ed] severely deficient, the next appropriate steps will be administered."

On October 25, 2007, McCann filed a second performance review of plaintiff. Notably, the rating period for that performance review ran from May 27, 2007 to November 24, 2007–so plaintiff was evaluated nearly one month before the rating period was scheduled to end. Plaintiff again received scores of "unsatisfactory" in five of the six categories. With respect to plaintiff's strengths McCann wrote "[s]trengths are still not identifiable." Again, McCann included a lengthy discussion of plaintiff's work-related deficiencies which she concluded by noting "[a]fter a thorough evaluation of your performance you have shown no significant improvement, I recommend dismissal." This performance review was signed by McCann and reviewed and signed by Eubanks. Plaintiff wrote "I refuse to sign."

On November 2, 2007, plaintiff emailed Sophiny Pek-Lilly, defendant's labor relations chief, to describe the discriminatory treatment that she felt she had suffered. In that email, plaintiff informed Pek-Lilly that she wished to file an "official charge of discrimination." Pek-Lilly and plaintiff met on November 16, 2007 to discuss plaintiff's allegations. Thereafter, plaintiff provided Pek-Lilly with a written statement of everything discussed at the meeting. In that statement, plaintiff alleged for the first time that Harrison had discriminated against her. Pek-Lilly met with plaintiff again several days later to discuss the new allegations. On November 21, 2007, Pek-Lilly wrote a memorandum to file detailing plaintiff's allegations but finding no evidence of discrimination based on either age or religion. "It is clear that [plaintiff] is having difficulty grasping the work," Pek-Lilly wrote, "[plaintiff] acknowledges this herself

and has made few arguments to dispute the statements regarding her performance." That same day, plaintiff was terminated from her position.

Plaintiff appealed her termination to the Pennsylvania State Civil Service Commission. Hearings on her claim were held May 2, 2008 and June 25, 2008. On December 9, 2008, the Commission affirmed her dismissal, finding that plaintiff was terminated because she was unable to perform a critical duty required of her position. On January 6, 2009, plaintiff filed an eight-count complaint in this Court. She alleged that defendant discriminated against her because of her age and her religion. On April 15, 2009, I granted defendant's unopposed motion to dismiss plaintiff's claims of age discrimination. Defendant now moves for summary judgment with respect to the remainder of plaintiff's claims.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material fact. Id. at 322-23. If the moving party sustains the burden, the nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. See

Anderson, 477 U.S. at 255.

When a properly supported motion for summary judgment is made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). However, the "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the moving party. Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

DISCUSSION

I.      Discrimination Based on Religion - Disparate Treatment

A.      Legal Precepts

28 U.S.C. § 2000e-2(a)(1) makes it unlawful for any employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." The Court of Appeals has held that a plaintiff invoking section 2000e-2(a)(1) may prove her case under either the pretext theory, set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), or the mixed-motive theory, originally set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), and subsequently amended by statute. See Makky v. Chertoff, 541 F.3d 205, 213 (3d Cir. 2008). Although plaintiff may

9

pursue her case under both theories, see Armbruster v. Unisys Corp., 32 F.3d 768, 781 n.17 (3d Cir. 1994) (overruled on other grounds Smith v. Wilkinsburg, 147 F.3d 272, 277-78 (3d Cir. 1998), here she has pursued only a pretext theory in response to the motion for summary judgment. Pl.'s Br. at 14-17. In reviewing the facts of this case, I am mindful that my task is not to second guess an employment decision; rather, I must determine whether the employment decision was motivated by illegal discriminatory purpose. See Waris v. Heartland Home Healthcare Servs., Inc., No. 09-1904, 2010 WL 538054, at *2 (3d Cir. Feb. 17, 2010).

Proof of discrimination under a pretext theory involves a burden shifting analysis. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). First, the plaintiff must establish a prima facie case of discrimination: (1) she was a member of a protected class; (2) she was qualified for the position she sought; and (3) non-members of the protected class were treated more favorably. See Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 318-19 (3d Cir. 2000). If the plaintiff is able to establish a prima facie case, an inference of discriminatory motive arises and the burden of production shifts to the defendant to put forth a legitimate non-discriminatory reason for its actions. See id. at 319. This is a relatively light burden which "can [be] satisf[ied] . . . 'by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.'" See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (quoting St. Mary's Honor Ctr. v. Hicks, 508 U.S. 502, 509 (1993)). The defendant need not establish that the proffered reason actually motivated its decision but only that it may have. Id. Finally, if the defendant is able to put forth a legitimate, non-discriminatory reason for its actions, the plaintiff must demonstrate that the proffered reason is pretextual. See id. For the plaintiff to succeed under a pretext theory, she

must prove that the impermissible factor was the determinative factor in the adverse employment action.  See Watson v. Southeastern Pennsylvania Transp. Authority, 207 F.3d 207, 215 (3d Cir. 2000).  This standard is referred to in other contexts as "but for causation."  See LeBoon v. Lancaster Jewish Cmty. Ctr.Ass'n, 503 F.3d 217, 232 n.8 (3d Cir. 2007).

B.      Analysis

1.      Plaintiff Has Established a Prima Facie Case of Discrimination

Plaintiff has chosen to pursue her claims of discrimination under a pretext theory.  See Pl.'s Br. 14-17.  Defendant concedes that plaintiff is a member of a protected class and that she was terminated after receiving two negative performance evaluations.  See Def.'s Br. at 4.  There is also evidence that non-Muslim trainees received more or better training, more attention from their training supervisor, and were given more latitude to make mistakes without suffering repercussions.  See, e.g., Abdul Haqq Dep. 141:13-143:7, 146:14-147:21, 149:11-152:18 (Nov. 2, 2009).

As an initial matter, then, the dispute centers on the second prong of the prima facie case–whether plaintiff was qualified for the position.  This inquiry requires a determination of whether plaintiff possessed "the bare minimum requirement necessary to perform the job at issue."  See Makky, 541 F.3d at 215 (noting that a determination of whether plaintiff is qualified is identical whether the case was brought under a pretext theory or a mixed motive theory).  "Typically, this minimum requirement will take the form of some type of licensing requirement, such as a medical, law, or pilot's license, or an analogous requirement measured by an external or independent body rather than the court or the jury."  Id.; Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1993) ("In Title VII cases involving a dispute over

'subjective' qualifications, we have recognized that the qualification issue should often be resolved in the second and third stages of the McDonnell Douglas/Burdine analysis, to avoid putting too onerous a burden on the plaintiff in establishing a prima facie case . . . . Because the prima facie case is easily made out, it is rarely the focus of the ultimate disagreement."). Defendant argues that plaintiff "cannot present more than a scintilla of evidence that she was qualified to proceed beyond probationary status." Def.'s Br. at 4. Defendant points specifically to testimony that plaintiff received more training and attention from her training supervisor than any of her fellow trainees, and yet was unable to use the computer system or correctly authorize even one case. Id. Defendant characterizes this as an undisputed fact. See Def.'s Statement of Undisputed Facts ¶¶ 37-76, Dec. 8, 2009.

Plaintiff expressly disagrees. See Pl.'s Br. at 16. She claims that she had used computers for approximately twenty years prior to entering the DPW training class, see email from T. Safiyah Abdul Haqq to Ernestine Burnside (Aug. 1, 2007, 5:04 PM) (Def.'s Exh. F), and, on her own, mastered the computer system at issue. See Abdul Haqq Dep. 166:23-167:9. Moreover, she claims that before she finished classroom training she was proficient with the computer system. See id. at 168:8-15. This deposition testimony is sufficient at minimum to establish a prima facie case of discrimination. Accordingly, the burden of production shifts to defendant to present a legitimate non-discriminatory reason for plaintiff's termination.

2.      Defendant Has Presented a Legitimate Non-Discriminatory Reason for
        Plaintiff's Termination

Defendant asserts that it fired plaintiff because she was unable to perform her job satisfactorily. Def.'s Br. at 5. Defendant claims that plaintiff was overwhelmed by a caseload

that was only forty percent of an average caseload, at a stage when her fellow trainees were successfully handling a caseload of fifty percent.  Id.  In addition to plaintiff's inability to handle a sufficient number of cases, she had also "demonstrated a consistent inability to navigate the computer system, required extensive time and assistance from [her training supervisor], and by the time of her termination had authorized only one case–and that was done incorrectly."  Id. Defendant's assertions are supported by the testimony of Erica McCann, Mary Harrison and Shanti Seelal.  Taken as true, as they must be for the purposes of the burden shifting analysis, see Fuentes, 32 F.3d at 763, defendant's evidence is sufficient to establish a legitimate non-discriminatory reason for the adverse employment action.

      3.      Plaintiff Has Borne Her Burden of Demonstrating that the Proffered Legitimate Non-Discriminatory Reason is Pretext

Because defendant has offered a legitimate non-discriminatory reason for plaintiff's termination, the burden shifts back to plaintiff to show that the proffered reason is pretextual.  In order to show pretext, the plaintiff must produce "some evidence from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  See Fuentes, 32 F.3d at 764.  If plaintiff cannot establish pretext, judgment must be granted in favor of defendant.

Plaintiff argues that the legitimate non-discriminatory reasons offered by defendant are factually baseless and therefore constitute pretext.  Specifically, she asserts that, contrary to defendant's allegations, she was handling a caseload of sixty to seventy percent at the time of her termination.  See Abdul Haqq Dep. 110:17-20 ("At the time of my termination I think it was 70

[percent].  It was either 60 [percent] or 70 [percent].  I think it was 70 [percent].").  But see Erica McCann CSC Testimony 167 (June 25, 2008) ("[Question:] What level of caseload was Ms. Abdul Haqq at [sic] the time of her removal from employment? [Answer:] Forty (40) percent.").  Plaintiff also states that she received less training than the others in her group, see Abdul Haqq Dep. 122:7-15, 142:5-146:20, that she asked for assistance but did not receive it, see id. at 148:1-152:11, that one of her trainers singled her out for the head covering she wore for religious purposes, see id. at 73:11-75:10, and that she was treated coldly by at least one of her trainers, see id. at 200:13-201:17.  Finally, plaintiff asserts that, despite some setbacks, she eventually mastered the CIS program on her own.  See id. at 167:3-9.

Plaintiff's testimony that she received less training than others in her group and that she was nonetheless successful in fulfilling her job requirements is sufficient to create a genuine issue of material fact.  If a jury believes plaintiff, defendant's proffered legitimate non-discriminatory reason for firing plaintiff could be nullified.  Such question can only be resolved after making a credibility determination which is, of course, the unique province of the jury.  See Scully v. US WATS, Inc., 238 F.3d 497, 506 (3d Cir. 2001).

Taylor v. JFC Staffing Assocs., — F. Supp. 2d —, 2009 WL 5217064, at *10 (M.D. Pa. Dec. 30, 2009), is analogous in that the plaintiff's testimony created a sufficient genuine issue of material fact to defeat summary judgment.  There, plaintiff alleged that defendant fired him because he was African American.  See id. at *4.  Defendant responded that it fired plaintiff because he was generally disruptive and made several comments regarding the September 4, 2009 shootings at Virginia Tech that caused his supervisors to be concerned.  See id. at *8. These reasons were sufficient to establish a legitimate, non-discriminatory reason for the firing.

See id.  In considering the pretext prong, however, the Court held that the plaintiff's depositional testimony stating that he was not generally disruptive and never made comments regarding the Virginia Tech shootings were sufficient to raise a genuine issue of material fact as to whether the proffered legitimate non-discriminatory reasons were pretextual.

This case presents a similar situation.  Plaintiff and defendant disagree as to whether plaintiff received appropriate training and fulfilled her job responsibilities.  Because this disagreement raises a genuine issue of material fact, I will deny defendant's motion for summary judgment on this point.

II.     Discrimination Based on Religion - Hostile Work Environment

A.      Legal Precepts

Title VII also prohibits the establishment of a work environment that is hostile to members of a protected class.  See Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999) (applying hostile work environment analysis to allegations of sexual harassment).  In order to state a claim under the rubric of hostile work environment, plaintiff must show: (1) she suffered intentional discrimination because of her religion; (2) the discrimination was severe or pervasive[6]; (3) the discrimination detrimentally affected plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same religion in that position; and (5) the existence of respondeat superior liability.  See Abramson v. William Paterson Coll. of New

---

[6]     Until 2006, the Court of Appeals required that discrimination be "pervasive and regular."  See, e.g., Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001).  In 2006, however, the Court of Appeals altered its formulation of the standard to conform to Supreme Court precedent.  See Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006) (citing Pa. State Police v. Suders, 542 U.S. 129, 133 (2004)).  The standard I apply here–"severe or pervasive"–comes from Jensen.

Jersey, 260 F.3d 265, 276-77 (3d Cir. 2001).

In evaluating a claim of hostile work environment, I am mindful of the Supreme Court's cautionary instruction that Title VII is not designed to be a "general civility code." Faragher v. Boca Raton, 524 U.S. 775, 788 (1998), quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998). Accordingly, "offhanded comments and isolated incidents" are insufficient to sustain a hostile work environment claim. See Carver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005). "Rather, the conduct must be extreme [enough] to amount to a change in the terms and conditions of employment." Id. (internal citations omitted). In determining whether the conduct is sufficiently severe or pervasive to implicate Title VII, District Courts must consider the totality of the circumstances. See id. (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)). Such circumstances "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 263 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

B.      Analysis

Defendant argues that the conduct plaintiff alleges was not severe or pervasive enough to state a claim for hostile work environment.[7] Plaintiff, in response, points to a series of actions by

_____

[7]      I use "hostile work environment" and "harassment" interchangeably. See Brown v. J. Kaz, Inc., 581 F.3d 175, 182 n.4 (3d Cir. 2009) (quoting Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001)) ("As to her hostile work environment claim, Brown simply failed to provide any evidence of 'harassment ... so severe or pervasive that it alter[ed] the conditions of [her] employment and create[d] an abusive work environment.'").

McCann and Harrison[8] that she alleges were sufficiently severe or pervasive enough to constitute harassment: (1) McCann began "writing up" plaintiff for "virtually any [sic] and everything she did at work, using a form that normally is used for disciplinary purposes[;]" (2) McCann would provide "hands on" and "one-on-one" training to plaintiff's peers while "shunn[ing]" plaintiff; (3) McCann mentioned the fact that she went to church; (4) McCann singled out plaintiff for "on spot grilling - 'pop quizzes[;]'" (5) "McCann embarrassed plaintiff by accusing her of 'boycotting' McCann in front of the class[;]" and (6) Harrison implied that plaintiff's religious headcovering might be a "fad."  Pl.'s Br. at 10-12.

Defendant argues that plaintiff has not presented sufficient evidence to show that plaintiff's workplace was "permeated with discrimination, ridicule, and insults against [plaintiff] in particular or Muslims in general."  Def.'s Br. at 7.  In support of its assertion, defendant argues that the only allegation specifically relating to plaintiff's religion is Harrison's implication that plaintiff's religious headcovering might be a fad and that such conduct was insufficiently severe to create a hostile work environment.  See id. at 7-8.  Defendant further argues that defendant's criticism of plaintiff's work product cannot support a hostile work environment claim because "it is indisputable that McCann treated plaintiff as she did the other, non-Muslim trainees."  See id. at 8.

My review of the record reveals a genuine issue of material fact as to whether defendant treated Muslims and non-Muslims equally.  Indeed the essence of plaintiff's allegations is that she was given less training than non-Muslims and, when she failed as a result of the deficient

---

[8]     At her deposition, plaintiff stated that only McCann and Harrison discriminated against her with respect to her religion.  See Abdul Haqq Dep. 93:22-23.

training, was treated more harshly than non-Muslims.  However, in order to prove a claim of hostile work environment plaintiff must show more than mere disparate treatment–she must show that severe or pervasive conduct by defendant altered the terms or conditions of her employment.  See Carver, 420 F.3d at 262.  Courts in this Circuit have considered evidence of harassment on a sliding scale: "some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive."  See E.E.O.C. v. Bimbo Bakeries USA, Inc., No. 09-1872, 2010 WL 598641, at *5 (M.D. Pa. Feb. 17, 2010) (citing Jensen, 435 F.3d at 499 n.3)).

Plaintiff has failed to satisfy her burden in this regard.  No reasonable jury could conclude that defendant's conduct was severe or pervasive enough to alter the terms or conditions of plaintiff's work environment.  First, none of the alleged incidents taken alone are severe enough to alter plaintiff's work environment.  See, e.g., King v. City of Philadelphia, 66 Fed. Appx. 300, at *3 (3d Cir. April 1, 2003) (a racial epithet, a physical shove and a work-related threat all directed at the plaintiff were held to be insufficiently severe to constitute harassment).  To succeed, then, plaintiff must show that the conduct of which she complains was pervasive.  There is no evidence to support that position.  According to plaintiff's testimony, she was written up twice, see Abdul Haqq Dep. 42:13-43, and she was subjected to three pop quizzes, see id. at 38:14-16, during her six month terms.  She claims that McCann made reference to the fact that she was a Christian "on at least three occasions," see id. at 217:9-10, and that Mary Harrison would occasionally "mention that she was a Christian and talk about going to church," see id. at 216:1-11.  She also claims that she received less "hands on" and "one-on-one" training than her

peers and thus was "shunned" by McCann.[9]  See id. at 141:18-142:13.  Finally, plaintiff claims

that McCann once publically accused plaintiff of "boycotting" McCann's class, see id. at 213:16-

23, and on another occasion Harrison implied that plaintiff might be wearing her religious

headcovering as a "fad."  See id. at 89:1-91:5.  Even when the evidence is viewed in the light

most favorable to plaintiff, none of the alleged conduct was either severe or pervasive enough to

alter plaintiff's work environment.  The conduct was infrequent and, plaintiff's conclusory

allegations notwithstanding, neither physically threatening nor especially humiliating.  See

Carver, 420 F.3d at 262.  With respect to the "shunning" she received from McCann, the Court

of Appeals has noted that "a cold shoulder can be hurtful, but it is not harassment."  See Jensen,

435 F.3d at 452 (quoting Brooks v. City of San Mateo, 229 F.3d 917, 929 (9th Cir. 2000)).  In

other words, defendant's conduct was not sufficient to "transform the ordinary tribulations of the

workplace into a legally cognizable hostile work environment claim."  See Lester, 290 F. Supp.

---

[9]        I note that much of this conduct already forms the basis of plaintiff's disparate
treatment claim.  Although the Court of Appeals has not decided whether evidence of disparate
treatment can also form the basis of a hostile work environment claim, several District Courts
have cautioned against blurring the lines between the two causes of action.  See, e.g., Lester v.
Natsios, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or
retaliation claims, therefore, are different in kind from a hostile work environment claim that
must be based on severe and pervasive discriminatory intimidation or insult."); Parker v. State of
Del., Dept. Of Public Safety, 11 F. Supp. 2d 467, 475 (D. Del. 1998) ("the dangers of allowing
standard disparate treatment claims to be converted into a contemporaneous hostile work
environment claim are apparent. Such an action would significantly blur the distinctions between
both the elements that underpin each cause of action and the kinds of harm each cause of action
was designed to address.").  Indeed, the Supreme Court has noted that "hostile environment
claims are very different in kind from discrete acts."  Nat'l R.R. Passenger Corp. v. Morgan, 536
U.S. 101, 115-16.  Having decided that the allegations are insufficiently severe or pervasive to
constitute harassment, I need not decide whether evidence of disparate treatment can also form
the basis of a hostile work environment claim.  The concerns of other Courts on this issue,
however, are well reasoned.

at 33 (internal quotations omitted) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) and Baskerville v. Culligan Int'l Co., 50 F.3d 428, 431 (7th Cir. 1995)).

The Court of Appeals has affirmed the grant of summary judgment in favor of the defendant in lawsuits involving far more pervasive and severe conduct. For example, in Hamera v. County of Berks, 248 Fed. Appx. 422, 425-26 (3d Cir. 2007), the plaintiff was employed at the Berks County Correctional Facility. Over the course of sixteen months, the plaintiff's co-workers made a total of nine insulting comments regarding the plaintiff's alcoholism and his prior employment as a Catholic priest. Such comments included a coworker's inquiry "about members of the clergy engaging in sexual acts with altar boys and about a sex scandal involving priests and nuns[;]" a coworker that "stated that [the plaintiff] was a homosexual pedophile who derived pleasure from having sex with little boys and who lured altar boys into sexual acts with promises of candy[;]" and a coworker who, at a roll call meeting, referred to plaintiff as "the wino sitting in the back." See Hamera v. County of Berks, No. 05-2050, 2006 WL 1985791, at *1-2 (E.D. Pa. July 11, 2006). The Court of Appeals affirmed the District Court's grant of summary judgment in favor of the defendant, finding that "[t]he harassment was not sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive working environment[.]" See Hamera, 248 Fed. Appx. at 425 (internal citations omitted).

The alleged harassment in this case is much less severe and pervasive than the harassment suffered by the plaintiff in Hamera. Accordingly, I will grant defendant's motion for summary judgment with respect to this claim.

III.    Discrimination Based on Religion - Retaliation

    A.    Legal Precepts

Title VII prohibits an employer from retaliating against an employee for opposing a discriminatory practice. 42 U.S.C. § 2000e-3(a) provides:

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

To state a claim for retaliation, the plaintiff must show that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). With respect to the first element of the prima facie case, activity protected by Title VII includes participation in certain formal Title VII proceedings, such as proceedings before the EEOC or in a federal court, as well as less formal opposition to the perceived discrimination. See id. The discrimination opposed by the employee need not actually be unlawful under Title VII, but the employee must hold in good faith an objectively reasonable belief that the activity she opposes is unlawful. See id. at 341. To establish the third element of the prima facie case, the plaintiff must produce enough evidence that a reasonable jury could conclude that the adverse employment action was motivated by retaliatory animus. See id.

Where a plaintiff succeeds in establishing its prima facie case, the McDonnell Douglas burden shifting analysis applies. See id. The defendant must put forth a legitimate, non-retaliatory reason for its conduct. See id. Then, the burden shifts back to the plaintiff to show

that the reason advanced by the defendant is pretextual and the real reason behind the adverse

employment action was retaliation.  See id.

B.      Analysis

Defendant argues that it is entitled to summary judgment on this claim for three reasons.

First, because plaintiff cannot show that there is a causal relationship between her complaints of

discrimination and the adverse employment action that she suffered.  Def.'s Br. at 10.  Second,

because she did not engage in protected activity when she complained to the union and human

resources.  Id.  Third, because defendant had a legitimate non-discriminatory reason for its

negative performance evaluations and for its decision to terminate plaintiff.  Def.'s Br. at 11.

Plaintiff, of course, disagrees with each of these arguments.  I will discuss each argument in turn.

1.      Plaintiff Has Presented Sufficient Evidence to Establish a Causal
        Connection Between the Adverse Employment Action and Her
        Complaints of Discrimination

Defendant argues first that no reasonable jury could find a causal connection between

plaintiff's complaints of discrimination and the adverse employment action she suffered because

McCann and defendant documented their negative assessments of plaintiff before she

complained of discrimination to anyone.  Def.'s Br. at 9.  In determining whether plaintiff has

presented enough evidence of causality to survive summary judgment, the Court of Appeals has

instructed District Courts to view the evidence in its totality.  LeBoon, 503 F.3d at 232-33.

"Where the temporal proximity between the protected activity and the adverse action is

'unusually suggestive,' it is sufficient standing alone to create an inference of causality and

defeat summary judgment."  Id. at 232 (citing Clark County School Dist. v. Breeden, 532 U.S.

268, 273-74 (2001)).  Otherwise, considerations include "[evidence of] intervening antagonism

or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." See id. In other words, in analyzing whether there is a causal connection between an adverse employment action and complaints of discrimination, Courts look to two primary factors: "timing and evidence of ongoing discrimination." See Abramson, 260 F.3d at 288.

Plaintiff has proffered sufficient evidence to raise an inference that the adverse employment action was caused by retaliatory animus. I note at the outset, however, that the temporal proximity of plaintiff's termination to her complaint does not alone establish an inference of causation because almost four months elapsed between plaintiff's initial complaint, lodged in late July, and McCann's October 25, 2007 recommendation that she be terminated.[10] Such a lengthy period of time is insufficient by itself to raise an inference of retaliation. See LeBoon, 503 F.3d at 233 (finding that a gap of three months between the complaint and the termination cannot, without more, create an inference of causation). She renewed her complaint on November 2, 2007 via an email to Sophiny Pek-Lilly, the chief of the labor relations unit. See Email from Abdul Haqq to Pek-Lilly, Nov. 2, 2007 2:02 PM (Def.'s Exh. O). By that time, however, McCann had already recommended that plaintiff be terminated. See Employee Performance Review, Oct. 25, 2007 (Def.'s Exh. N).

Notwithstanding the lack of unusually suggestive temporal proximity, the circumstances surrounding plaintiff's termination are sufficient to establish an inference of causation and therefore to defeat summary judgment. Plaintiff asserts that after she complained to the union

---

[10] Although plaintiff was not terminated until November 21, 2007, the alleged retaliatory action occurred on October 25, 2007 when McCann recommended termination.

about the discriminatory treatment she was suffering, McCann began to act "very differently" toward her. Specifically, shortly after plaintiff complained to her union representative in July 2007, McCann allegedly confronted plaintiff and told her that if she refused to resign McCann would have her terminated. See Abdul-Haqq CSC Testimony, 52:4-14 (May 2, 2008). McCann also allegedly told plaintiff that there was no point to completing the training because she would not pass it successfully anyway. See id. Plaintiff asserts that several days later, after plaintiff had submitted her complaints in writing to the union, McCann "humiliated" her by stating to the class that plaintiff had been trying to "boycott" McCann. See id. at 51. McCann allegedly explained that she thought the boycott was motivated by the fact that plaintiff could not do her job. See id. For the remainder of plaintiff's term, she was required to submit daily logs documenting the work that she did, see Abdul Haqq CSC Testimony 91:19-25, and received negative reviews and evaluations from McCann. One such review–plaintiff's second performance review–occurred on October 25, 2007 even though the rating period for that review extended through November 24, 2007. There, McCann recommended terminating plaintiff. Plaintiff asserts that the fact that she received her second review nearly one month early could be evidence of retaliation.

Overall, I find that plaintiff has submitted sufficient evidence to establish an inference of a causal relationship between plaintiff's complaint of discrimination and her termination.

2. Plaintiff Engaged in Protected Activity when She Complained to Human Resources and the Union

Defendant argues that plaintiff's complaints to human resources and the union did not constitute protected activity because plaintiff did not have an objectively reasonable belief that the activity she opposed was unlawful under Title VII. Def.'s Br. at 10. The Court of Appeals

has held that an employee must have an objectively reasonable belief that the activity she opposes is unlawful under Title VII. Moore, 461 F.3d at 341. In support of its argument, defendant conclusorily states that "the record is devoid of any evidence that McCann's criticism of plaintiff's work was based on plaintiff's religion." Def.'s Br. at 10. I disagree. For the reasons discussed more thoroughly throughout this opinion, there is enough evidence of religious discrimination to render plaintiff's belief objectively reasonable.

3.      There Is a Genuine Issue of Material Fact as to Whether Defendant's
        Proffered Legitimate Non-Retaliatory Reason for Plaintiff's Termination
        Is Pretext

Finally, defendant argues that plaintiff's poor job performance constitutes a legitimate non-retaliatory reason for her termination. I agree for the reasons discussed supra in my analysis of plaintiff's disparate treatment claim. Accordingly, the burden of production shifts back to plaintiff to establish that the proffered legitimate non-discriminatory reason is pretext. See Sanders v. Nicholson, 316 Fed. Appx. 161, 165 (3d Cir. 2009) (citing Moore, 461 F.3d at 342).

A plaintiff may survive summary judgment by producing some evidence from which a jury could rationally conclude that the defendant's proffered legitimate non-discriminatory reasons for the adverse employment action were pretext. See Moore, 461 F.3d at 342; see also Fuentes, 32 F.3d at 765 ("holding that a plaintiff may survive summary judgment by demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons.") (emphasis in original). It is not enough for the plaintiff baldly to label defendant's reasons as pretext. See Sanders, 316 Fed. Appx. at 165.

Plaintiff has satisfied her burden. She has testified that her job performance was satisfactory and that defendant's assertion to the contrary is factually baseless. A reasonable jury could choose to believe plaintiff on this point, thereby nullifying defendant's legitimate non-retaliatory explanation for plaintiff's termination. Because plaintiff's retaliation claim raises a genuine issue of material fact, I will deny defendant's motion for summary judgment on this claim.

IV.     Violation of Pennsylvania's Human Relations Act

Defendant argues that plaintiff's Pennsylvania Human Relations Act claim is barred by the Eleventh Amendment. Def.'s Br. at 11.[11] The Eleventh Amendment to the United States Constitution provides "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign state." The Supreme Court has held that before a state can be sued in federal court, the state must waive its immunity under the Eleventh Amendment. See Atascadero State Hosp. v. Scanlon, 473 U.S 234, 238 (1995). Pennsylvania has not done so with regard to claims under the PHRA. See Fitzpatrick v. Pennsylvania Dept. of Transp., 40 F. Supp. 2d 631, 635 (E.D. Pa. 1999) (citing 42 Pa. Cons. Stat. Ann. § 8521(b)). Accordingly, plaintiff's PHRA claim is barred by the Eleventh Amendment and I will grant defendant's motion for summary judgment on this claim.

CONCLUSION

---

[11]     Aside from requesting that defendant's motion for summary judgment be denied in its entirety, plaintiff offers no substantive response to this argument.

For the reasons I have discussed above, defendant's motion for summary judgment will be granted in part and denied in part. Defendant's motion will be granted with respect to plaintiff's claims of hostile work environment (Count IV) and violation of the PHRA (Count VIII). However, because I find a genuine issue of material fact with respect to plaintiff's claims of disparate treatment (Count I) and retaliation (Count VI), defendant's motion will be denied with respect thereto.

An appropriate Order follows.